IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LISA NEWMAN and DONALD NEWMAN, as Co-Administrators of the Estate of Richard Ferretti, *Plaintiffs* | : : : : : | CIVIL ACTION<br><br>NO. 17-2517 |
| v. | : : | |
| CITY OF PHILADELPHIA, *et al.* *Defendants* | : : | |

NITZA I. QUIÑONES ALEJANDRO, J.                                                      DECEMBER 23, 2020

## MEMORANDUM OPINION

**INTRODUCTION**

Plaintiffs Lisa and Donald Newman ("Plaintiffs"), as co-administrators of the estate of Richard Ferretti ("Ferretti"), brought this action pursuant to 42 U.S.C. § 1983 and Pennsylvania common law against Defendant Shannon Coolbaugh ("Defendant" or "Coolbaugh"), a police officer in the Philadelphia Police Department.[1] In their complaint, Plaintiffs allege that Coolbaugh used excessive force and committed assault and battery when Coolbaugh shot and killed Ferretti as he attempted to flee arrest in his vehicle. Before this Court is Coolbaugh's motion for summary judgment, filed pursuant to Federal Rule of Civil Procedure ("Rule") 56, in which he argues that he is entitled to qualified immunity. The issues raised in the motion have been fully briefed and are ripe for disposition. For the reasons set forth herein, Defendant's motion is denied.

---

[1]   Plaintiffs also asserted a *Monell* claim against Defendant the City of Philadelphia, which is not addressed in the underlying motion.

**BACKGROUND**

In the motion for summary judgment, Defendant argues that his conduct was constitutionally permissible and that he is entitled to qualified immunity. When ruling on a motion for summary judgment, a court must consider the evidence in the light most favorable to the non-movant (here, Plaintiffs). *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011). The facts relevant to Plaintiffs' claims and Defendant's qualified immunity defense are summarized as follows:[2]

> On May 4, 2016, at approximately midnight, Christopher Fernandes (a student at St. Joseph's University) noticed that a red van (driven by Ferretti) was repeatedly driving past him on Lancaster Avenue in Philadelphia while he waited to meet a friend. Fernandes thought the van was suspicious because it was repeatedly circling the block. When Fernandes's friend, Austin Reid, arrived, the two men decided to follow the van to determine if they could learn why the driver was repeatedly circling the area. While following the van, the men observed that the driver was driving erratically. After watching the van circle the area for approximately thirty to forty minutes (twenty to thirty times around the block), Fernandes called 911 at approximately 12:47 a.m.
>
> Defendant Coolbaugh and his partner, Officer Clifford Doorley, were the first officers to arrive. Upon approaching the area in their undercover vehicle, Coolbaugh and Officer Doorley saw the red van "flying past" them on Lancaster Avenue in the opposite direction in which they were driving. They followed the van and observed what they thought was reckless driving. Because they were in an unmarked car, they called for a marked unit to assist, which arrived a few minutes later, driven by Officer Michael Smith. Officer Smith turned on his lights and siren and pulled the van over. Coolbaugh and Officer Doorley then circled back with the intention of blocking traffic on Lancaster Avenue.
>
> Coolbaugh and Officer Doorley arrived at the intersection of Lancaster and Overbrook Avenues, where the van was stopped behind a civilian vehicle. Officer Smith was approximately thirty feet behind the van in his marked vehicle, as was a second police vehicle driven by Officer Brian Pavgouzas. The civilian vehicle that had been stopped in front of the red van left.
>
> As Coolbaugh exited his car, he unholstered his gun and held it in the lower protective position, and approached the van by circling to the right in a maneuver he termed "slicing the pie" or "circling the pie." According to Coolbaugh, this approach kept him from being directly in front of the van. At this same time,

---

[2]  These facts are derived from both parties' statements of fact, briefs, and the exhibits attached thereto. To the extent that any facts are disputed, such disputes will be noted and, if material, will be construed in Plaintiffs' favor pursuant to Rule 56.

Officer Doorley was circling around to the left. While he approached the van, Coolbaugh instructed the occupant (Ferretti) to show his hands and to stop the van and put it in park. Coolbaugh's vehicle was parked two to three car lengths in front of the van.

As Coolbaugh approached the van with his gun drawn, Ferretti backed up his van and turned it so that the van faced Coolbaugh. Ferretti then put the van in drive and accelerated towards Coolbaugh. At the time Ferretti began accelerating forward, Coolbaugh contends that he was less than five feet away from the van's front bumper. Coolbaugh testified that he attempted to sidestep the van but was unable to move out of the way quickly enough and was forced to discharge his weapon in self-defense.[3] Coolbaugh fired four shots. Forensic evidence shows that none of the bullets hit the windshield or the front side of the van. Rather, the front driver's side window was shattered, one bullet hit the driver's side fender, and Ferretti was hit by three bullets traveling from his left side to his right.[4] The van traveled through the intersection, and never struck Coolbaugh or any other person. Ferretti subsequently died from the gunshot wounds.

**LEGAL STANDARD OF REVIEW**

Rule 56 governs the practice of summary judgment motions. Rule 56 provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if its existence or non-existence might affect the outcome of the case, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Under Rule 56, the court must view the evidence in the light most favorable to the non-moving party. *Galena*, 638 F.3d at 196.

---

[3]   As discussed in detail below, Plaintiffs dispute Coolbaugh's contention that he was just five feet from and directly in the path of Ferretti's van when it accelerated towards him and that he fired his weapon in self-defense.

[4]   When interviewed at the scene, Coolbaugh told the supervising sergeant that he had fired his weapon in a "southeast" direction.

The movant bears the initial burden of identifying evidence that "demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004). Once the movant has met its initial burden, the nonmovant must rebut the motion by identifying "some evidence in the record that creates a genuine issue of material fact." *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006). In doing so, the nonmovant must rely on facts in the record and "cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument[,]" *id.*, or on "bare assertions, conclusory allegations[,] or suspicions." *Fireman's Ins. Co. of Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). If the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial[,]" then the court should grant summary judgment for the movant. *Celotex*, 477 U.S. at 322.

In cases where "the victim of deadly force is unable to testify," *Abraham v. Raso*, 183 F.3d 279, 294 (3d Cir. 1999), the United States Court of Appeals for the Third Circuit (the "Third Circuit") has recognized that when a court is ruling on summary judgment in such a case, the court "should be cautious . . . to 'ensure that the officer[s are] not taking advantage of the fact that the witness most likely to contradict [their] story—the person shot dead—is unable to testify.'" *Id.* (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)). Thus, a court should avoid simply accepting "'what may be a self-serving account by the officer[s]. It must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational fact finder that the officer[s] acted unreasonably.'" *Id.* (quoting *Scott*, 39 F.3d at 915).

**DISCUSSION**

Defendant moves for summary judgment on Plaintiffs' § 1983 claim for excessive force on the basis that he is entitled to qualified immunity because his actions were objectively reasonable and did not violate a clearly established legal right. In their response, Plaintiffs argues that genuine issues of material fact exist with respect to the reasonableness of Defendant's conduct and, further, that Ferretti's right to be free from the use of excessive force against him under the existing circumstances was clearly established at the time of the incident.

### *Plaintiff's § 1983 Claim[5] for Excessive Force*

Qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The officer seeking qualified immunity has the burden of establishing his or her entitlement to the affirmative defense. *Halsey v. Pfeiffer*, 750 F.3d 273, 288 (3d Cir. 2014) (citing *Reedy v. Evanson*, 615 F.3d 197, 223 (3d Cir. 2010)). To determine whether an officer is qualifiedly immune from suit, a court must determine (1) whether the officer violated a constitutional right and, if so, (2) whether the right was clearly established. *See Saucier v. Katz*, 533 U.S. 194, 201-02 (2001). These questions can be addressed in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). This Court will first address whether Coolbaugh's alleged use of deadly force violated the Fourth Amendment.

---

[5]   Section 1983 provides an avenue for private citizens to seek civil remedies when they have been deprived of their rights by a state official in violation of federal law. 42 U.S.C. § 1983. The statute is not a source of substantive rights, but serves as a mechanism for vindicating rights otherwise protected by federal law. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002); *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996). To establish a § 1983 claim, a plaintiff must show "a violation of a right secured by the Constitution and laws of the United States and that the alleged deprivation was committed by a person acting under color of state law." *Kneipp*, 95 F.3d 1204 (3d Cir. 1996) (quoting *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995)).

### *Whether Defendant's Actions Violated Ferretti's Fourth Amendment Rights*

Plaintiffs allege that Coolbaugh used excessive force in violation of the Fourth Amendment by firing four shots at Ferretti's van as it passed Coolbaugh during Ferretti's flight. The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures." To prevail on an excessive force claim, a plaintiff must establish "that a 'seizure' occurred and that [such seizure] was unreasonable." *Abraham v. Raso*, 183 F.3d 279, 288 (3d Cir. 1999) (citing *Brower v. County of Inyo*, 489 U.S. 593, 599 (1989)). Here, it is undisputed that Ferretti was seized, within the meaning of the Fourth Amendment, when Coolbaugh shot him. *See Tennessee v. Garner*, 471 U.S. 1 (1985). Coolbaugh argues, however, that the undisputed evidence establishes that his use of force was objectively reasonable under the circumstances and subject to qualified immunity.

It is well-settled that an officer's use of deadly force is reasonable only where "it is necessary to prevent escape, and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Garner*, 471 U.S. at 3. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene" and in light of the "totality of the circumstances." *Graham*, 490 U.S. at 396. Making this determination requires careful attention to the facts and circumstances of each particular case, including: the severity of the alleged crime; whether the suspect posed an immediate threat to the safety of the officers or others; and whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Id*. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id*. at 396-97. As such, this Court must determine whether,

"giving due regard to the pressures faced by the police, was it objectively reasonable for the officer to believe, in light of the totality of the circumstances, that deadly force was necessary to prevent the suspect's escape, and that the suspect posed a significant threat of death or serious physical injury to the officer or others[.]" *Abraham*, 183 F.3d at 289.

Here, this Court finds that genuine issues of material fact exist regarding the reasonableness of Defendant's use of deadly force, which culminated in Ferretti's death. Although it is undisputed that Ferretti was resisting arrest at the time of the shooting, "this factor alone cannot justify the use of deadly force." *Plaza-Bonilla v. Cortazzo*, 2009 WL 605909, at *6 (E.D. Pa. Mar. 9, 2009) (citing *Abraham*, 183 F.3d at 289). More importantly, Plaintiffs have pointed to evidence that, when viewed in their favor, could suggest that Defendant's use of deadly force was unreasonable.

Defendant argues that the evidence demonstrates that he had a reasonable basis for believing that he faced an immediate threat of serious harm upon observing Ferretti accelerate the van directly toward him, while he was just "five feet" away from the front of the van. While Defendant Coolbaugh is correct that these facts, *if undisputed*, would likely establish that Ferretti posed an immediate threat of harm to Coolbaugh's safety at the moment he drove toward Coolbaugh, those facts are not undisputed. However, as Plaintiffs argue, a reasonable jury could find, based on the existing record, that Coolbaugh did not shoot Ferretti: (1) from a point in the immediate and direct path of Ferretti's moving vehicle; and/or (2) until *after* Ferretti had driven past Coolbaugh such that Coolbaugh was not in danger of being hit.

Though Coolbaugh and the other officers testified that Coolbaugh stood directly in front of Ferretti's van at a distance of approximately five feet, Plaintiffs' forensic evidence arguably suggests that Coolbaugh stood further away from the van when it began moving forward and/or that Coolbaugh was not directly in the van's path, which may support an inference that Coolbaugh

was not under any threat of immediate, serious harm at the time he fired shots at Ferretti. Plaintiffs proffered the expert opinion of William Vigilante who opined that a person standing five feet in front of a vehicle (as Coolbaugh contends) would not have had sufficient time to respond either by discharging a firearm or moving out of the way of the vehicle without being hit.[6]  This evidence creates a genuine issue of material fact as to where and how far away Coolbaugh was standing, from the van, when Ferretti accelerated towards Coolbaugh without touching him with the van.

In addition, Plaintiffs proffered evidence that refutes Coolbaugh's contention that he was directly in the path of Ferretti's van and unable to avoid being hit when he fired his gun. Specifically, Plaintiffs point to the fact that none of Coolbaugh's shots hit the windshield or the front side of the vehicle but, rather, only the front driver's side window was shattered and a bullet struck the front driver's side fender. Additionally, the autopsy report indicates that Ferretti was struck by multiple bullets that traveled from left to right, which is consistent with Coolbaugh having fired the shots from outside the driver's side of the van. Further, Coolbaugh's own statement made just hours after the incident indicate that he fired his weapon in a "southeast" direction while the van was traveling east, also supports Plaintiffs' contention that Coolbaugh fired his weapon while standing to the side of the van, rather than in the van's direct path. While this evidence may not conclusively eliminate the possibility that Coolbaugh was standing in the direct path of Ferretti's van when he fired his gun, it does create genuine issues of material fact as to Coolbaugh's exact location when he fired his gun and his ability to avoid being struck by the vehicle. *See Abraham v. Raso*, 183 F.3d 279, 293-95 (3d Cir. 1999) (finding genuine issue as to

---

[6]     Mr. Vigilante based his finding, in part, on a limited reconstruction conducted for the Philadelphia Police Department by Pennsylvania State Police Trooper Gregory Butler. Trooper Butler's reconstruction showed that, at maximum acceleration, Ferretti's van would have traveled three feet in 0.71 seconds—far less than the standard perception/reaction time of 1.6 seconds. Adopting Trooper Butler's formulas, Mr. Vigilante found that Ferretti's van would have traveled five feet in 0.92 seconds.

whether officer reasonably acted in self-defense against car driven by suspect where fatal shot came through driver's side window and officer was not significantly injured or even struck by the car).

Coolbaugh's argument that he fired his weapon to protect others (as opposed to protecting himself) is also subject to genuine issues of material fact. Of the four officers on the scene, only Coolbaugh fired his weapon. Notably, Coolbaugh testified that the only reason he fired his weapon was fear for his own life. Two of the four officers on the scene (Officers Smith and Pavgouzas) were situated behind Ferretti's van, and both testified that they were not concerned for their own safety. Coolbaugh's partner (Doorley) was positioned on the opposite side of the road as Coolbaugh, presumably out of the direct path of Ferretti's vehicle. Further, Coolbaugh did not present evidence that there were any civilian bystanders in the immediate vicinity of the van. Indeed, nobody was hit by Ferretti's vehicle. This collection of evidence, at least, creates a genuine issue of material fact as to Defendant Coolbaugh's contention that Ferretti posed a threat of serious injury to any others.

In sum, genuine issues of disputed facts remain as to how close Coolbaugh was to the vehicle when Ferretti accelerated forward, and whether the van moved directly towards Coolbaugh or posed a threat to anyone else. Consequently, a reasonable jury could conclude that Coolbaugh's use of deadly force was not justified by either an immediate threat posed by Ferretti to the safety of Defendant Coolbaugh or to the safety of others. *See Abraham*, 183 F.3d at 292-93 (finding genuine issue regarding threat to others where it was unclear how close officers were when suspect backed up towards them and how fast the suspect was driving, and noting that "the fact that [the suspect] collided forcefully with a parked car . . . [did] not by itself show that [he] posed a significant threat of death or serious physical injury to other people").

Moreover, this case is not only similar to, but governed by *Abraham*, wherein the Third Circuit reversed a district court's grant of summary judgment where there was conflicting evidence as to the reasonableness of a guard's use of deadly force. In *Abraham*, the defendant (like Coolbaugh) testified that she was standing directly in front of the decedent's car when the decedent began to drive directly toward her. *Id*. at 285. The defendant fired her weapon through the front driver's side window, striking the driver in the arm and chest. *Id*. at 285. The driver eventually died from the gunshot wounds. At the motion for summary judgment stage, his estate argued that the defendant fired from the side of the decedent's car and, thus, was safely out of harm's way when she used deadly force. *Id.* at 286. The district court granted the motion for summary judgment. Reversing the decision of the district court, the Third Circuit found that summary judgment was inappropriate because there were genuine issues as to what risk the decedent posed to the defendant and others. *Id.* at 292-93. Specifically, the Third Circuit found that it was unclear how close the defendant and other guards were to the decedent's car as he was backing up and how fast he drove in reverse, *id.* at 293 and, therefore, that summary judgment was inappropriate because there were genuine issues of material fact as to what risk the decedent posed to the defendant's life. *Id.* at 293-94. The Court further found that there was conflicting evidence regarding where the defendant was standing when she shot the decedent and that, even if she were hit or brushed by the decedent's car, the evidence showed she was not significantly injured, which created a genuine issue about whether she had time to get out of the way and the gravity of the threat posed to her. *Id.* at 294. Moreover, the Court noted that "[a] passing risk to a police officer is not an ongoing license to kill an otherwise unthreatening suspect." *Id.* (citing *Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993)). Based on the record before it, the Court could not "say as a matter of law that it was objectively reasonable for [the defendant] to believe that she

10

was in danger." *Id.* at 294. As such, the Court thought a jury should determine (1) whether the defendant fired her gun after she was out of harm's way *and* (2) whether the decedent's conduct was so dangerous as to warrant the use of deadly force. *Id.* at 295.

Here, Plaintiffs have presented similar evidence as that presented in *Abraham* to support the possibility that Coolbaugh fired shots from a location and/or at a point in time when Ferretti's van did not pose a reasonable threat to Coolbaugh's life or to the safety of others. As in *Abraham*, it is undisputed that some of Coolbaugh's shots traveled through the driver's side of the vehicle and none of them traveled through the windshield. In addition, as with the decedent in *Abraham*, the autopsy report showed that the bullets entered Ferretti through his left side. This evidence creates the same genuine issues of material fact as existed in *Abraham*: (1) whether Coolbaugh fired the deadly shots at a time when Coolbaugh could objectively, reasonably believe his life was at risk, and (2) whether Coolbaugh could have avoided such risk. As in *Abraham*, these issues must be left for the trier of facts.[7]

### 1. Whether Ferretti's Constitutional Right was Clearly Established

Having found that Plaintiffs have presented sufficient evidence from which the trier of facts could conclude that Coolbaugh violated Ferretti's Fourth Amendment right to be free from excessive force, this Court must next address the second prong of the qualified immunity analysis—*i.e.*, whether that right was clearly established at the time of the incident.

Coolbaugh argues that even if the force used was unreasonable, he is entitled to qualified immunity because his actions did not violate a "clearly established" right. Specifically, he contends that whether the contours of the right were clearly established depends on the specific facts of a given case, and that no case squarely governs the use of force under the circumstances

---

[7] A recent panel of the Third Circuit reached a similar conclusion. *See Eberhardinger v. City of York*, 782 F. App'x 180, 181 (3d Cir. 2019).

in this case. In response, Plaintiffs argues that there need not be a precedent directly on point for a right to be clearly established and that the Third Circuit's decision in *Abraham* (and other cases) clearly established the right at issue here. This Court agrees with Plaintiffs.

As previously noted, the second prong of the qualified immunity analysis requires a court to determine whether a plaintiff's purported constitutional right was "clearly established" at the time of the defendant's alleged misconduct. *Lamont*, 637 F.3d at 182 (quoting *Saucier*, 533 U.S. at 201–02). "Clearly established" means that "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, __ U.S. __, 138 S. Ct. 577, 589 (2018) (internal quotations and citation omitted).[8] In determining that right, this Court must keep in mind the Supreme Court's repeated directives "not to define clearly established law at a high level of generality" but, instead, conduct this analysis "in light of the specific context of the case." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quotation marks omitted).

For qualified immunity purposes, "clearly established rights are derived either from binding Supreme Court and Third Circuit precedent or from a robust consensus of cases of persuasive authority in the Courts of Appeals." *Bland v. City of Newark*, 900 F.3d 77, 84 (3d Cir. 2018) (internal quotations and citation omitted). In determining whether the alleged right was clearly established at the relevant time, there does not need to be "a case on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). That is, to hold that a right was clearly established, a court does not need to find that the very conduct at issue was previously held unlawful; rather, a court

---

[8] The shooting in this case occurred on May 4, 2016, so only precedents that clearly established rights as of that date are relevant to this inquiry. *See Bryan v. United States*, 913 F.3d 356, 363 (3d Cir. 2019).

must "conclude that the firmly settled state of the law, established by a forceful body of persuasive precedent, would place a reasonable official on notice that his actions obviously violated a clearly established constitutional right." *Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 639 (3d Cir. 2015) (citations omitted). "The dispositive question is whether the violative nature of particular conduct is clearly established. This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix*, 577 U.S. at 12 (internal quotes and citation omitted). Finally, qualified immunity is the rule, not the exception: "police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, __ U.S. __, 138 S. Ct. 1148, 1153 (2018) (quoting *Mullenix*, 136 S. Ct. at 309).

Here, all of Defendant's arguments with respect to the clearly-established prong merely repeat his argument that an officer does not violate the Fourth Amendment when he uses deadly force to protect himself or others from immediate serious injury. (*See* ECF 39-2 at pp. 41-44). This argument is misdirected at the second prong, as it applies only to the first prong, addressed above. In fact, this argument and the plethora of cases on which Defendant relies to support it, actually establish that the right at issue here *was* clearly established at the time of the shooting. All of the cases cited by Defendant stand for the proposition that an officer does not violate a person's Fourth Amendment right to be free from excessive force where the officer reasonably believes that the force is necessary to prevent immediate, serious injury to himself or others, even in the context where the plaintiff is driving a vehicle. The reverse is also clearly established: an officer violates a person's Fourth Amendment right to be free from excessive force when an officer uses deadly force in the absence of a reasonable belief that the force is necessary to prevent immediate, serious injury to himself or others. Indeed, the Third Circuit expressly held as much in *Lamont v. New Jersey*:

> It has long been the law that an officer may not use deadly force against a suspect unless the officer reasonably believes that the suspect poses a threat of serious bodily injury to the officer or others. In short, the dispute in this case is about the facts, not the law. ***The doctrine of qualified immunity is therefore inapposite.***

637 F.3d 177, 185 (3d Cir. 2011) (emphasis added) (internal citations omitted).

Further, in *Eberhardinger v. City of York*, 782 F. App'x 180 (3d Cir. 2019), a panel of the Third Circuit concluded that the Third Circuit's previous binding decision in *Abraham* decided in 1999, was sufficient to place an officer on notice that his conduct (using deadly force against an individual driving car when the driver did not pose a threat to the safety of the officer or others) was unlawful. *Id*. at 185. The *Eberhardinger* Court also noted that "[o]ther Courts of Appeals have reached the same conclusion in the specific context of a car chase . . . that '[i]t has long been clearly established that, absent any justification for the use of force, it is unreasonable for a police officer to use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others.'" *Id*. at 186 (citations omitted); *see also Orn v. City of Tacoma*, 949 F.3d 1167, 1178 (9th Cir. 2020) ("By the time of the shooting in October 2011, at least seven circuits [including the Third Circuit in *Abraham*] had held that an officer lacks an objectively reasonable basis for believing that his own safety is at risk when firing into the side or rear of a vehicle moving away from him."). Because this precedent indicates that the right at issue here was, indeed, clearly established at the time of the underlying incident, and in light of the existence of the genuine issues of material fact discussed above, Defendant is not entitled to qualified immunity on the existing record.

### *Plaintiffs' State Law Claims*

Defendant also seeks summary judgment on Plaintiffs' state law claims for assault and battery, wrongful death, and survival on the basis that Defendant is immune from liability under

Pennsylvania's Political Subdivision Tort Claims Act (the "PSTCA"), 42 Pa. Cons. Stat. § 8541 *et seq*. The PSTCA provides immunity to municipalities and their employees for official actions, unless the employee's conduct goes beyond negligence and constitutes "a crime, actual fraud, actual malice, or willful misconduct." *Id*. at § 8550. Here, as discussed at length above, Plaintiffs have proffered evidence sufficient for a trier of fact to find that Defendant's alleged conduct went beyond mere negligence. As such, Plaintiffs' state law claims are not barred by the PSTCA. *See Boyden v. Twp. of Upper Darby*, 5 F. Supp. 3d 731, 744 (E.D. Pa. 2014) ("Taking the facts Boyden has pled as true, he has stated a claim for excessive force, and so he has also stated claim for assault and battery."); *Barkus v. Knirnschild*, 2018 WL 124415, at *13 (W.D. Pa. Mar. 9, 2018) (having held that a jury reasonably could conclude that the shooting was objectively unreasonable, "[i]t follows, then, that the conduct may be seen as sufficiently outrageous and 'unexpectable by the master' that sovereign immunity does not apply.").

**CONCLUSION**

For the reasons set further herein, this Court finds that Defendant Coolbaugh is not entitled to qualified immunity on the present record and, therefore, Defendant's motion for summary judgment is denied. An Order consistent with this Memorandum Opinion follows.

*NITZA I. QUIÑONES ALEJANDRO*, U.S.D.C. J.